**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 21-cr-262 (TNM)** |
| **v.** | : | |
| | : | |
| **PAUL MICHAEL GUERTIN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM**
**IN OPPOSITION TO MOTION TO SUPPRESS**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully files its opposition to the Defendant's Motion To Suppress,

ECF No. 22-1.

**INTRODUCTION**

On March 29, 2021, a federal grand jury returned the Indictment against the defendant on

counts of wire fraud, in violation of 18 U.S.C. § 1343, and obstructing an official proceeding, in

violation of 18 U.S.C. § 1512(c)(2).  The Indictment charges that the defendant, a former Foreign

Service Officer, deliberately and fraudulently concealed information in a State Department

background investigation and security clearance adjudication for a Top Secret security clearance.

Specifically, the defendant deceived the State Department about an unreported sexual relationship

with a Chinese national that he initiated after adjudicating the Chinese national's visa application;

about his significant gambling debts and financial problems due to gambling; and about the fact

that he entered into an unreported loan agreement with two Chinese nationals for $225,000 that

was collateralized by his own home.  The defendant explicitly intended to conceal this information

from State Department investigators because he knew it would jeopardize his Top Secret security

clearance and his continued employment by the State Department.  The defendant's deception

went to the heart of his suitability for a position of trust in a sensitive position as a Foreign Service Officer—namely, his financial vulnerability, vulnerability to foreign influence, and abuse of his office as a consular visa officer.

The Indictment was the culmination of a complex and long-running investigation. The defendant was initially suspected of visa fraud and related offenses as well as illegal gambling activity. After conducting an initial investigation involving a substantial volume of financial data, review of the defendant's anomalous activity in the State Department's Consular Consolidated Database (CCD) and other unusual visa activity, review of the defendant's official State Department email account, and non-content email metadata for the defendant's personal email accounts obtained via Court order pursuant to 18 U.S.C. § 2703(d), the investigation team applied for its first search warrant. On November 8, 2016, Special Agent Robin Leipfert of the U.S. Department of State, Office of Inspector General ("State-OIG") swore out an affidavit for a search warrant of the defendant's Google Gmail email account (the "Google Affidavit" or "Google Aff."). and Magistrate Judge Harvey issued the warrant. The contents of the Google Affidavit are discussed in further detail below.

Google initially withheld the vast majority of records within the scope of the Google warrant. Google argued that much of the email content was stored on servers located outside the United States and withheld such content under color of the Second Circuit's opinion in *In the Matter of a Warrant To Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corporation*, 829 F.3d 197 (2d Cir. 2016) ("*Microsoft*"), *vacated sub nom. United States v. Microsoft Corp.*, 138 S. Ct. 1186 (2018). Google made several successive productions in the ensuing months, eventually producing a large volume of email messages and some attachments, but continued to withhold a portion of the search warrant records.

On February 27, 2017, the government filed a Motion for an Order To Show Cause seeking to compel Google to comply with the search warrant.  Following oral argument, on June 2, 2017, Magistrate Judge Harvey issued a Memorandum Opinion and Order rejecting *Microsoft* and ordering Google to produce the records.  *See In the Matter of the Search of Information Associated with [Redacted]@gmail.com that Is Stored at Premises Controlled by Google, Inc.*, 2017 WL 2480752 (D.D.C. June 2, 2017).  Google sought review of Magistrate Judge Harvey's decision by Chief Judge Howell, who affirmed the decision in a Memorandum Opinion issued on July 31, 2017.  *See In re Search of Information Associated with [Redacted]@gmail.com that Is Stored at Premises Controlled by Google, Inc.*, 2017 WL 3445634 (D.D.C. July 31, 2017).  The order was held in abeyance while Google appealed to the D.C. Circuit.  On March 23, 2018, while Google's appeal was still pending, Congress enacted the Clarifying Lawful Overseas Use of Data Act (CLOUD Act), as part of the Consolidated Appropriations Act, 2018, Pub. L. 115–141, which legislatively overruled *Microsoft*.  In light of the CLOUD Act, on April 17, the Supreme Court dismissed a pending appeal of *Microsoft* as moot and vacated the Second Circuit's decision.  *See Microsoft*, 138 S. Ct. at 1187-88.  On June 7, 2018, the D.C. Circuit vacated the pending appeal in the Google case and issued an order vacating the district court decisions pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).  On June 8, 2018, Google produced the remaining records pursuant to the Google search warrant in this case.

While litigation over the Google warrant was ongoing, and with partial search warrant returns from Google, the government sought a second search warrant for the defendant's Microsoft Hotmail email account.  On December 8, 2017, Special Agent Leipfert swore out the affidavit in support of the Microsoft warrant (the "Microsoft Affidavit" or "Microsoft Aff."), and Magistrate Judge Meriweather issued the warrant.

The parties engaged in substantial pre-indictment discussions.  On November 5, 2019, the government presented an extensive reverse proffer to the defendant, and made an informal plea offer on July 10, 2020.  The Indictment was returned on March 29, 2021.

## STANDARD OF REVIEW

"The Supreme Court has described the task of evaluating probable cause as 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Probable cause is an objective standard 'to be met by applying a totality-of-the-circumstances analysis.'"  *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Vinton*, 594 F.3d 14, 21 (D.C. Cir. 2010)).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232.

"[P]robable cause does not require certainty, or proof beyond a reasonable doubt, or proof by a preponderance of the evidence.  The Supreme Court has stated that probable cause requires a fair probability."  *Id.* at 660.  Under this "fair probability" standards, probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975), and "it is and 'has always been thought sufficient to hear only the prosecutor's side,'" *Kaley v. United States*, 571 U.S. 320, 338 (2014) (quoting *United States v. Williams*, 504 U.S. 36, 51 (1992)).  Accordingly, "[p]robable cause 'is not a high bar,'" and requires "'only a probability or substantial chance of criminal activity, not an actual showing of such activity.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley*, 571 U.S. at 338, and *Gates*, 462 U.S. at 232).

In evaluating a facially valid search warrant, the task of a reviewing court is not to decide, in the first instance, whether it would find that the warrant establishes probable cause. Under the well-accepted standard of review, the court need only satisfy itself that the Magistrate had a "substantial basis" in finding probable cause. As Chief Judge Howell recently summarized in *United States v. Smith*, 2021 WL 2982144 (D.D.C. July 15, 2021):

> A showing of probable cause is not a high bar, and, in the context of a search warrant, requires only a fair probability that evidence of a crime will be found in a particular place. . . . The task of a district court reviewing a magistrate's determination that a warrant is supported by probable cause is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. While courts must conscientiously review the sufficiency of the affidavits upon which warrants were issued, the affidavits are entitled to a presumption of validity, and the magistrate's initial determination of probable cause is entitled to great deference.

*Id.* at *5 (internal citations, quotations, and alterations omitted). "[A] reviewing court must give an affidavit a 'sensible, pragmatic reading, one that takes account of the pressure of time and the typical level of verbal skills in laymen police officers.'" *United States v. Richardson*, 861 F.2d 291, 293-94 (D.C. Cir. 1988) (quoting *United States v. Watts*, 540 F.2d 1093, 1097 (D.C. Cir. 1976)). Probable cause is evaluated "at the time that law enforcement applies for a warrant." *United States v. Griffith*, 867 F.3d 1265, 1274 (D.C. Cir. 2017) (internal quotations omitted); *accord United States v. Allen*, 629 F.2d 51, 54 (D.C. Cir. 1980) (probable cause for arrest evaluated based "on information available to the officer at the time of arrest, not on later-acquired information").

### A.  Good Faith Exception Under *Leon*

Even if the reviewing court finds an affidavit lacked a substantial basis for the Magistrate's determination of probable cause, the court "may not exclude evidence 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its

scope.'" *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)).  "The reason is evident: 'In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.'" *Id.* (quoting *Leon*, 468 U.S. at 921).  An exception to *Leon*'s good-faith standard exists only "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  *Leon*, 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

### B. *Franks* Hearing Framework

In *Franks v. Delaware*, the Supreme Court held that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  438 U.S. at 155-56.  At such a hearing— known as a *Franks* hearing—the defendant bears the burden of proving "the allegation of perjury or reckless disregard" by "a preponderance of the evidence."  *Id.* at 156.  If the defendant carries that burden, the court then examines the affidavit and determines whether, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  *Id.*  If so, the search will be voided and the fruits of the search excluded under the exclusionary rule.  *Id.*  The Supreme Court cautioned that its ruling was intended to have "a limited scope," in order to prevent it from being "misused by defendants as a convenient source of discovery" and burdening district courts.  *Id.* at 167.

Thus, as the D.C. Circuit has summarized the *Franks* framework, "[a] movant seeking to obtain a *Franks* hearing 'must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (quoting *United States v. Richardson*, 861 F.2d 291, 293 (D.C. Cir. 1988)). To establish "reckless disregard for the truth," the Supreme Court made it clear that "[a]llegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171. Instead, as the D.C. Circuit has construed it, "reckless disregard" in the *Franks* context means that the affiant "in fact entertained serious doubts as to the truth" of his statements. *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979) (internal quotations omitted). "This subjective test may be met not only by showing actual deliberation but also by demonstrating that there existed obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* (internal quotations omitted).

## ARGUMENT

### I.    The Magistrate Judge Had a Substantial Basis for Concluding that Probable Cause Existed

The warrant affidavits in this case provided the Magistrate Judge with a "substantial basis" to conclude that probable cause existed to suspect the defendant was engaged in offenses involving visa fraud; and was also engaged in potentially illegal online gambling activity. *See Smith*, 2021 WL 2982144, at *5; *see also Gates*, 462 U.S. at 236. Given the "presumption of validity" owed to warrant affidavits, *Franks*, 438 U.S. at 171, and the "great deference" paid to the Magistrate's original determination of probable cause, *Gates*, 462 U.S. at 236, nothing further is required to reject the defendant's facial challenge.

In broad strokes, the warrant affidavits showed that the defendant (1) engaged in a significant volume of private email communications with U.S. visa applicants whose visas he adjudicated as a consular officer, or was otherwise involved in; (2) received thousands of dollars in payments from anonymous offshore shell companies, including shell companies in Cyprus and Latvia, which did not correspond to any outside employment or foreign accounts declared to the State Department; and (3) gambled in amounts that suggested he was living beyond his legitimate means and had other, undeclared sources of income.  In addition—although less central to the probable cause determination—the affidavits listed further "red flags," including the defendant's intervention in support of an Indonesian visa applicant with whom he was in contact, the unusual number of Class B referrals (*i.e.*, official requests for preferential visa access) while he was posted to Pakistan, and payments received from a Chinese visa applicant (although the Google Affidavit went out of its way to highlight that the transactions could have been ordinary rental payments). *See generally* Google Aff. ¶¶ 15-33; Microsoft Aff. ¶¶ 17-53.

The combination of surreptitious communications with visa applicants, suspicious transactions, and unexplained wealth raised a fair probability that the defendant was engaged in some sort of scheme to accept money in exchange for favorable treatment in visa applications, in violation of 18 U.S.C. § 201(b)(1) and 18 U.S.C. § 1546(a), and that he laundered proceeds of such offenses in violation of 18 U.S.C. §§ 1956 and 1957.  Given the extensive evidence of email communications between the defendant and various visa applicants, there was a straightforward inference that his Google and Microsoft accounts would reveal evidence of the suspected violations.

With respect to the suspected illegal gambling offenses, the warrant affidavits showed that the defendant (1) used email to solicit others to join sports betting pools, including but not limited

to the World Cup and NCAA March Madness; (2) received sports betting payments through his PayPal account, including more than $12,000 from a single individual, and instructed them not to mention sports betting-related terms in the PayPal payment messages "as they'll block the account for gambling"; (3) engaged in tens of thousands of dollars in transactions on FanDuel; and (4) exhibited consciousness of guilt by deleting sports betting-related emails from his State Department email account after receiving notice that he was under investigation by the State Department Office of Inspector General.  *See generally* Google Aff. ¶¶ 34-42; Microsoft Aff. ¶¶ 54-61.

These facts established key elements of violations of the Wire Act, 18 U.S.C. § 1084, and the Unlawful Internet Gambling Enforcement Act (UIGEA), 31 U.S.C. § 5361, *et seq.*, beyond dispute—namely, the defendant used wires to transmit bets or wagers on any sporting event or contest, and he accepted payments in connection with such gambling on sports events.  *See* 18 U.S.C. § 1084(a) (criminal offense includes "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest"); 31 U.S.C. § 5363(2) (criminal offense includes "knowingly accept[ing], in connection with the participation of another person in unlawful Internet gambling . . . an electronic fund transfer, or funds transmitted by or through a money transmitting business . . . from or on behalf of such other person").  The only real question was whether the defendant engaged in such activity for profit, that is, as a person "engaged in the business of betting or wagering," 18 U.S.C. § 1082(a); *see also* 31 U.S.C. § 5363 (same).   To be sure, there was no direct evidence that the defendant was taking a commission, fee, or percentage. But "[p]robable cause does not require a prima facie showing" of a criminal violation, *see United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005), and "a probable cause determination may be

based in part on reasonable inferences," *see United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006).  The defendant's organizational role, the large scale of the activity, high dollar value (receiving more than $12,000 from one individual), and consciousness of guilt exhibited by his concern about detection by PayPal and email deletions raised a fair inference that he was engaged in such activities as a business.

## II. The Defendant Has Not Carried His Burden of Establishing Intentional False Statements or Statements Made with Reckless Disregard for the Truth that Were Material to Probable Cause

Even if the Court finds the Magistrate lacked a substantial basis to determine that the warrants established probable cause, it must still deny the motion to suppress unless the defendant carries his burden pursuant to *Franks* of showing that "(1) the affidavit[s] contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth.'" *Becton*, 601 F.3d at 594.  Here, the defendant has not made a "substantial preliminary showing" necessary to trigger a *Franks* hearing.  *See Franks*, 438 U.S. at 155-56.

### A. Any Factual Errors Were Inadvertent and Were Not Material to Probable Cause

The defendant raises, at most, three true factual errors in the warrant affidavits: (1) that the defendant served in the State Department's intelligence office, the Bureau of Intelligence & Research ("INR"), for three years, when in fact he only served one year; (2) that, where the defendant sent a personal email to himself containing the personal identifying information (PII) of three Chinese visa applicants, he adjudicated all three applications, when in fact he adjudicated two out of the three; and (3) that a trash search of the defendant's house found no evidence that a Chinese couple resided there, when in fact it recovered a temporary driver's license renewal form for the husband listing his address at the defendant's house.  ECF No. 22-1, at 7-13, 18-20.  None

of these errors was intentional or made with reckless disregard for the truth, and none of them was material to the ultimate issue of probable cause.

### 1. Error Regarding Length of Tour at INR Was Inadvertent and Immaterial

The Google Affidavit stated that the defendant served in INR "from August 2011 until September 2014," approximately three years. Google Aff. ¶ 12. In fact, the defendant apparently served in INR for one year before moving on to a position as an Indonesia desk officer in the Bureau of East Asian and Pacific Affairs.

The misstatement regarding the length of defendant's tour of duty in INR was obviously nothing more than an inadvertent error. Indeed, the defendant does not include it (at 36-39) among the statements he believes were intentionally false or made with reckless disregard for the truth. Further, it is difficult to perceive what the alleged materiality of such a misstatement would be. The defendant suggests (at 7-8) that it went to the allegation that he had access sensitive classified information. But that is still immaterial to the suspected violations alleged in the warrant affidavits. And the defendant undeniably *did* have access to Top Secret information while assigned to INR—and, for that matter, throughout his entire tenure at the State Department.

### 2. Error Regarding Adjudication of Two Versus Three Visa Applicants Was Inadvertent

The Google Affidavit stated that the defendant sent a message from his Gmail account to his State Department email account on December 14, 2008, which contained nothing but the names and dates of birth for three Chinese nationals whose visas were adjudicated at the Shanghai consulate while the defendant was posted there. The Google Affidavit stated that "Guertin was the adjudicating official in all three cases." Google Aff. ¶ 16. In fact, the defendant adjudicated only two of the three cases, although he accessed the CCD entry for the third applicant.

As a preliminary matter, by focusing on whether the *number* of adjudications was correct and the merits of each visa application, the defendant elides over the most significant aspect of the PII email: that the defendant was storing the names and PII of visa applicants in his private Google account—including at least *two* applicants whose visas he personally adjudicated. As the affidavit accurately stated, "[t]here is no known legitimate explanation for why Guertin would have stored personal information about these visa applicants whose applications he adjudicated . . . ." Google Aff. ¶ 18. That was true when the warrant was sworn out, and it remains true today.

The defendant offers a strange non-explanation for the PII email. He claims (at 12) that information about the three applicants "did have specific, ongoing relevance" to an internal debate within the defendant's section. He also claims (at 12) that they "would be relevant" for the defendant's performance evaluation. First, given the hypothetical phrasing and claims about "relevance" to the defendant's duties, it is not at all clear whether the defendant is claiming this is actually what happened, or just what *might* have happened. Second, by offering two unrelated explanations, the defendant raises the question of which explanation is supposed to be true. Third, neither explanation explains why the defendant was storing the visa applicants' PII in his private Google account in the first place, or why *their PII*, specifically, was needed for him to participate in a work-related debate or assist in his performance review. The defendant also implies (at 9) that he needed the PII for APPLICANT ONE for an "internal office effort" to "review and document" adjudications by another Foreign Service Officer, but the timing does not line up: the defendant's PII email was sent on December 14, 2008; the defendant did not "review" APPLICANT ONE's file and make the unusual notation in it until February 10, 2010. The defendant's inability to offer a straightforward explanation for the PII email today only underscores how anomalous it would

have appeared to the agent in 2016, especially in combination with the defendant's surreptitious email communications with visa applicants and suspicious financial activity.[1]

In any event, there is no evidence that the error regarding whether the defendant adjudicated all three applications was anything other than an honest mistake. The warrant affidavits synthesized complex evidence gathered from a variety of sources in an investigation that had already stretched for more than two years, including State Department visa databases, the defendant's State Department email account, non-content metadata for the defendant's personal email accounts obtained via § 2703(d) order, and financial records from an extensive financial investigation. Given this complexity, it is far more likely that minor factual errors crept into the affidavits through "negligence or innocent mistake," *Franks*, 438 U.S. at 171, than that the agent engaged in a deliberate scheme to deceive the Magistrate by inserting minor factual errors into the affidavits.

Reviewing the discussion of APPLICANT ONE's case file in the affidavit only bolsters the conclusion that the error was an innocent mistake. The affidavit accurately recounted that APPLICANT ONE was initially denied a visa in September 2008 and that the adjudicating officer wrote a notation to the file regarding the applicant's "belligerent" response to the denial. Google Aff. ¶ 17. Then, the affidavit continued: "*On February 10, 2010*, Guertin issued a visa to APPLICANT ONE, noting a comment in the record to disregard the previous note as the preceding adjudicating officer was suffering extreme mental duress." *Id.* (emphasis added).

---

[1] The defendant also argues (at 12-13) that the agent should have noticed the non-content email metadata for a single message sent from HunstmanJM@state.gov to the defendant's Google address on November 28, 2009—nearly a *year* after the defendant's unexplained PII email—and, from this single data point, been able to unfold an absurd chain of extrapolations. Specifically, the defendant argues that the metadata from this single message should have informed the agent that (a) the email corresponded to an incident in which a private plane piloted by an American crashed in the Shanghai consular district; (b) the defendant worked all weekend to send "sensitive updates" to then-Ambassador Jon Huntsman regarding the incident; (c) November 28, 2009 was a Saturday; therefore (d) it was "not uncommon" for the defendant to work from home—and, somehow, this explains why the defendant was storing PII for at least two Chinese visa applicants whose visas he adjudicated, and for a third applicant whose visa records he later accessed.

Comparing the affidavit's narrative to the CCD record, *see* Def. Ex. 16, it is obvious what happened. The agent observed the defendant's February 10, 2010 *notation* regarding the previous visa denial, and somehow misread it (or misremembered it when drafting the affidavit) to indicate that the defendant did not simply access the CCD for the sole purpose of responding to a notation entered 17 months earlier, but also to make a new visa adjudication decision on the same date, February 10, 2010. That would have been an understandable mistake. After all, the CCD exists to document visa applications and adjudications. It was certainly unusual for a Foreign Service Officer to go to the trouble of accessing a visa case file that had been closed for 17 months without a pending visa application before him. The agent's mistaken reading of the CCD entry was erroneous, but it was an honest mistake.

### 3. Error Regarding Adjudication of Two Versus Three Visa Applicants Was Not Material to Probable Cause

To be sure, if the agent had not inadvertently misread the CCD entry APPLICANT ONE, the affidavit would not have made the further claim that "Guertin's . . . favorable adjudication of that visa is questionable." Google Aff. ¶ 17. But correcting that misstatement would have had only a marginal effect on the overall affidavit. First, as noted above, the primary significance of the PII email was that the defendant was inexplicably storing names and PII for visa applicants in his private Google account. Clarifying that the defendant did not adjudicate APPLICANT ONE's visa application would not have explained why the defendant was storing her PII in the first place, nor would it have explained the other two cases, whose visas the defendant did adjudicate. Second, the defendant's unusual notation, by itself, is not inconsistent with an inference of visa fraud. It could have been an effort to give APPLICANT ONE favorable treatment by rehabilitating her case file for *future* visa applications. If the affidavit had correctly stated that the defendant inexplicably stored PII for three visa applicants in his private Google account, and that he adjudicated two out

14

of the three cases and subsequently made an unusual notation in the case file of the third applicant for the sole purpose of impugning the judgement of a colleague who denied her a visa, the overall impact of the evidence would have been substantially the same for the reviewing Magistrate's determination of probable cause.[2]

### 4.   Error Regarding Trash Search Was Inadvertent

The Google Affidavit stated that a search of discarded trash from the defendant's house found that "no evidence was recovered showing that PERSON A and/or her spouse have lived at Guertin's house."  Google Aff. ¶ 25 n.2.  In fact, the trash search actually recovered a ripped-up copy of a temporary driver's license renewal for PERSON A's spouse, which listed the defendant's house as his address.  The Memorandum of Activity (MOA) documenting the trash search was prepared by the agent who later swore out the Google Affidavit, although the search itself was conducted by two other State-OIG agents.

The government acknowledges the misstatement in Footnote 2.  At worst, however, it appears to have been the result of an inadvertent mistake.  Read in context, it is impossible to believe that Footnote 2 contained a deliberate misstatement intended to deceive the Magistrate into granting a meritless search warrant.

Consider where Footnote 2 fell within the affidavit's overall statement of probable cause. After reviewing the primary evidence of visa fraud—the defendant's surreptitious communications with multiple visa applicants whose visas he adjudicated, and his unexplained use of a private email account to collect PII for visa applicants—the Google Affidavit went on to discuss additional

---

[2] The defendant also expounds (at 10-12) about one of the other visa applicants whose PII was captured in the defendant's private email.  But the procedural history of this applicant's visa application is all beside the point, as the Google Affidavit made no claims about the applicant or the nature of the adjudication.  Further, the fact that the defendant went to such extraordinary lengths to rehabilitate the visa application after another officer issued a "hard" denial on grounds of fraud may well indicate the defendant's diligence, as he claims, but it could also indicate unwarranted favorable treatment.

"red flags" concerning the defendant's interactions with visa applicants.  These included the defendant's lobbying efforts in support of an Indonesian visa applicant, his large number of Class B visa referrals while assigned to Pakistan, and, finally, additional "Communications and Financial Transactions with Visa Applicants."  Google Aff. at 13.

Here, the Google Affidavit *accurately* stated that the defendant received more than $25,000 from PERSON A between 2015 and 2016, and was in communication with her since at least 2014. Google Aff. ¶¶ 25, 28.  But the affidavit also went out of its way to explain that the payments might have had an innocent explanation—namely, that PERSON A and her spouse were ordinary renters in the defendant's house.  (The affidavit also stated, accurately, that illicit payments could be disguised as legitimate payments.  *Id.* at 26.)  Over two pages, the affidavit listed fact after fact in support of this innocent, alternative explanation—including (a) that "[a]lmost all of these payments occurred on or about the first or last day of the month, which may be consistent with rental payments"; (b) PERSON A and her spouse listed the defendant's house in Washington, D.C. "as the place they intended to live while in the United States" in a 2013 visa application; (c) one check from PERSON A listed her address as the defendant's residence (although another check listed a different address in Arlington, Virginia); and added, in Footnote 2, that a trash search conducted on May 3, 2016 *confirmed* that "Guertin appears to rent out his house to legitimate residents."  *Id.* ¶¶ 25-27 & n.2.

Indeed, the erroneous statement was literally buried in a footnote, and covered up by a mountain of arguably exculpatory evidence prominently disclosed and discussed in the body of the affidavit.  None of this is consistent with the defendant's theory that the agent intentionally lied to mislead the Magistrate.  If the agent truly wanted to deceive the Magistrate with intentional misstatements, she could have come up with far more salacious material than the "no evidence"

line in Footnote 2—and, indeed, she could have omitted all the exculpatory detail included in the body of the affidavit.  Instead, the affidavit went well beyond the bare minimum required by the probable cause standard, which does not require the disclosure of exculpatory evidence, *see Kaley*, 571 U.S. at 338, and reflects an admirable effort to provide the Magistrate with a complete and balanced picture of all the evidence relating to the defendant's relationship to PERSON A.

Nor is there evidence of reckless disregard for the truth, which would require proving that the agent subjectively, "in fact entertained serious doubts as to the truth" of the misstatement in Footnote 2, *see Davis*, 617 F.2d at 694.  The guileless nature of the misstatement, and the fact that it was so obviously at odds with MOA documenting the trash search, strongly suggest inadvertent oversight—precisely the sort of "negligence or innocent mistake" that the Supreme Court emphasized was "insufficient" to overcome the presumption of validity for a search warrant.  *See Franks*, 438 U.S. at 171.

### 5.  Error Regarding Trash Search Was Not Material to Probable Cause

Whatever the nature of the misstatement in Footnote 2, it was not material to the Magistrate's determination of probable cause.  The clearest proof is the fact that the second affidavit—the Microsoft Affidavit—omitted the entire section discussing payments from PERSON A, including Footnote 2.  *See generally* Microsoft Aff.  Yet the Magistrate still found probable cause, and the Microsoft warrant was approved.  If a probable cause could be established without Footnote 2 at all, an erroneous statement within Footnote 2 regarding the trash search could not have been material to the overall assessment of probable cause.

Indeed, the entire section relating to PERSON A's payments to the defendant was marginal to the main thrust of the affidavit.  The primary evidence indicating visa fraud and related offenses was, as described above, evidence of surreptitious email communications and privately collecting

17

PII of visa applicants, combined with suspicious financial activity.   In context, the section discussing PERSON A's payments was almost an afterthought, and it was so loaded with exculpatory information as to render it insignificant to the overall mix of information presented to the Magistrate.

### B. The Defendant's Remaining Factual Disputes Do Not Establish Intentional Misstatements that Were Material to Probable Cause

Finally, the defendant's remaining claims (at 13-22) of perceived false statements and "material omissions" are meritless.   Most of the defendant's complaints are not about factual mistakes at all, but about debating the significance of the (undisputed) evidence that was included in the affidavits.   Nor does the defendant seriously contend that any of these alleged misstatements was intentional or made with reckless disregard for the truth.   For the sake of completeness, though, they are addressed below.

**Defendant's private email communications with visa applicants whose visas he adjudicated:** The Google Affidavit identified at least five visa applicants (APPLICANT TWO through APPLICANT SIX) communicated with the defendant via his private Google account close in time to the dates when the defendant adjudicated their visas—including one applicant (APPLICANT TWO) who was in communication with the defendant "on the same day as the adjudication and for almost an entire year thereafter."   Google Aff. ¶¶ 19-20.   The investigating team was aware of the existence of these communications from non-content email metadata obtained pursuant to a § 2703(d) order, but did not know the contents of the communications.   The agent was only able to correlate the emails to individual applicants by manually reviewing visa applications and searching for matching email addresses.   The existence of these "*ex parte*" private email communications—especially communications to the particular applicants whose cases were decided by the defendant, and so close in time to his adjudicatory decisions—was highly unusual.

If the defendant had legitimate, work-related inquiries to make of these applicants, it would have been natural to use his official State Department email account.  His decision to use an alternate email channel raised an obvious inference of intent to conceal (and for good reason, as discussed below).

The defendant raises a variety of scattershot arguments, but none of them is persuasive. The defendant argues (at 13) that the affidavit cited only five applications out of "more than 40,000" visas adjudicated by the defendant.  But even five instances of visa fraud would be punishable under the law—and a pattern of misconduct established in five cases would give rise to a fair probability that other episodes had also occurred.   The defendant argues (at 13) that the communications only occurred after the visas were adjudicated.  But visas can still be revoked after being granted, and they may need to be renewed.  The defendant was in a position to maintain influence over *future* visa decisions for each of these applicants.[3]   And the existence of post-adjudication communications makes it more likely that pre-adjudication communications might also exist—including communications carried on through other channels, evidence of which might be revealed in the post-adjudication emails (such as a reference to an earlier telephone conversation).   The defendant also argues (at 13-14) that the email metadata did not indicate "use of brokers," but the failure to identify *additional* incriminating evidence is irrelevant and does not undermine evidence already in the record.  And the defendant argues (at 14-15) that the five visa applicants were well-qualified for visas.  But even a well-qualified applicant might resort to bribery.  None of the defendant's arguments would have explained the defendant's secretive email communications with visa applicants whose cases he adjudicated.

---

[3] For example, he emailed to APPLICANT TWO about her visa renewal more than a year after granting her initial visa (and after carrying on a sexual relationship with her), joking that "[w]e were able to re-use ur very [bad] quality fingerprints."  Ex. 1.

Indeed, as the Google search warrant returns confirmed, the defendant's communications were intended to conceal wrongdoing.  The defendant routinely approached young Chinese women whose visas he adjudicated to make romantic overtures.  Search warrant returns reflect similar outreach to at least eight other women that paralleled his approach to APPLICANT TWO.  In one case, the defendant was so insistent that the visa applicant felt the need to explain she could not go out with him because she was engaged to be married.  *See* Ex. 2 ("I wanted to let you know and should have mentioned it from the begining but I am enganged and the more I think about it I dont think its right and know my my finence would not appreciate me going out with another guy even if its just for coffee.  I am sure you met lots of girls each day but I am already spoken for, I appreciate your interest but would not feel comforatbale going out and meeting socailly.").

The defendant's conduct, pressuring visa applicants into dates immediately after adjudicating their visas, while continuing to hold power over their visas or future visa renewals, was highly unusual and represented an abuse of his authority as a consular officer.  If discovered, it also would have raised serious questions about his trustworthiness and suitability for a Top Secret security clearance.  And sexual exploitation of visa applicants certainly could constitute bribery.  *See, e.g.*, *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ("Sexual intercourse, or the promise of sexual intercourse, is a thing of value under a bribery statute.").  The defendant's efforts to conceal these communications confirms the agent's assessment, at the time of the original Google search warrant, that the existence of such surreptitious communications was highly suspicious and indicative of wrongdoing.

**Indonesian visa applicant:**  The Google Affidavit identified an Indonesian visa applicant (APPLICANT SEVEN) whose visa was denied as an "intending immigrant" on July 3, 2007. Google Aff. ¶ 12.  The affidavit noted that (a) the defendant contacted the consular section in

Jakarta on July 10, 2007, to make inquiries in support of APPLICANT SEVEN's application, and (b) the defendant was in communication via his private Google email with APPLICANT SEVEN between 2007 and 2009.  *Id.*

The defendant baselessly asserts (at 15) that the agent "falsely stated" that APPLICANT SEVEN's application was denied because the adjudicating officer believed she was an intending immigrant.  But in support, the defendant offers an email the defendant received from a former consular official in Jakarta confirming the exact point made in the affidavit: "If you haven't had consular training yet, you probably don't realize that the law presumes that an applicant for a non-immigrant visa *is an intending immigrant* to the U.S. unless the applicant is able to demonstrate strong and compelling reasons to return home following a temporary visit to the U.S. . . .  [S]o it's difficult for someone in your girlfriend's situation to overcome the *presumption that she is an intending immigrant*."  ECF No. 22-1, at 15 (emphases added).

The defendant also alleges that the agent should have known that APPLICANT SEVEN was the defendant's girlfriend.  As proof, the defendant points to the above-referenced email from the former consular official in Jakarta—but fails to acknowledge that the email *was recovered from the defendant's Google account* pursuant to the Google search warrant.  In other words, the defendant faults the agent, in circular fashion, for not disclosing in the search warrant affidavit the content of the emails that the search warrant was intended to discover.[4]  The law does not require the level of omniscience that the defendant apparently expects.

---

[4] The defendant appeared to have copied and pasted this exchange from his official State Department email account, but the agent had no reason to know about this side-channel communication and specifically search it out among all of the defendant's work-related emails.

**Pakistan Class B referrals:** The Google Affidavit stated that the defendant made 23 Class B referrals while in Pakistan, which was "an unusually large number of referrals for a one-year period."  Google Aff. ¶ 24.

The defendant baldly asserts (at 16) that the agent's assessment "is false," but does not offer any evidence of falsity, only the defendant's contrary *opinion* that 23 was not actually that large a number.  Such empty rhetoric falls short of the defendant's heavy burden in a *Franks* motion leveling serious accusations of government misconduct.  The defendant also argues (at 16-18) the merits of the individual Class B referrals, but this is irrelevant and goes well beyond the carefully limited claim in the Google affidavit about the number—not the quality—of the Class B referrals.

**Suspicious transactions with offshore shell companies and substantial gambling activity:** The Google Affidavit explained that the defendant conducted transactions totaling tens of thousands of dollars with offshore shell companies, including shell companies in jurisdictions "known for high money laundering risk, such as Cyprus and Latvia."  Google Aff. ¶ 29.  In addition, the defendant engaged in a large volume of casino gambling activity, totaling more than $100,000 since in or about 2013.  *Id.* ¶ 30.  The significance of this activity was twofold: it suggested that the defendant was living beyond his means; and it was consistent with money laundering, as gambling can be used to disguise illicit proceeds as legitimate winnings.  *Id.* ¶ 31.

The defendant's lead argument (at 19-20) is, incredibly, that a Foreign Service Officer conducting tens of thousands of dollars in undisclosed transactions with shell companies in Latvia or Cyprus should have raised no eyebrows, because he was *only* conducting illegal online poker transactions with companies that routed payments offshore to evade the reach of U.S. law enforcement.  Whatever the merits of that argument, it is not responsive to the significance of the

gambling activity as explained in the affidavit—namely, that it was suggestive of undisclosed income, and that gambling could be used as a money laundering technique. *See* Google Aff. ¶ 31.

The defendant also criticizes (at 20) the affidavit's use of CTR data. As a preliminary matter, the government has identified additional CTRs that were inadvertently omitted from the documents previously produced in discovery.[5] These CTRs confirm the exact figures cited in the affidavit, including by documenting more than $100,000 in cash gambling transactions since in or about July 2013. *See* Ex. 3. The defendant argues that the CTR data shows both deposits and withdrawals. That is true but irrelevant to the actual claim made in the affidavit, which referred to the volume of gambling activity rather than net winnings or losses. Indeed, the affidavit explained further that a casino is only required to file CTRs for transactions in excess of $10,000, so the CTRs "likely understate" the defendant's total cash casino transactions. Google Aff. ¶ 30.

**Suspected illegal gambling activity:** The Google Affidavit also described evidence of suspected illegal gambling activity, including the defendant's solicitation of others to join sports betting pools; receipt of sports gambling payments via PayPal, including payments totaling more than $12,000 from one individual; instructions to participants on how to evade PayPal's compliance monitoring ("don't mention march madness in the title, as they'll block the account for gambling"); tens of thousands of dollars in transactions with FanDuel; and the defendant's consciousness of guilt evidenced by mass-deletion of gambling-related emails after leaning he was under investigation by State-OIG. Google Aff. ¶¶ 34-42.

---

[5] The CTRs were not produced in the initial rounds of discovery because they are not relevant to the events or offenses actually charged in the Indictment. In response to a defense request on September 6, 2021, the government pulled CTRs for the defendant and produced them in discovery. This initial pull was underinclusive because of the narrow search terms used to retrieve the data. The government has identified additional CTRs and produced them in a supplemental discovery production, and attached redacted copies hereto as Exhibit 3.

The defendant argues (at 21) that this evidence did not establish he was "engaged in the business" of betting under the Wire Act or UIGEA.   As discussed above, the defendant's organizational role in the gambling activity, the large scale of the activity, high dollar value, and consciousness of guilt exhibited by his concern about detection by PayPal and email deletions raised a fair inference that he was engaged in such activities as a business.[6]  *See Gourde*, 440 F.3d at 1071 (probable cause includes "reasonable inferences").

The defendant also reiterates his arguments (at 21-22) about whether fantasy sports websites such as FanDuel can be used for sports betting, but whatever the substantive merits of that dispute, there was no misstatement (intentional or otherwise) in how the information was presented in the affidavit.  The affidavit transparently stated that FanDuel was "a website that facilitates fantasy sports competitions for cash payouts, which may be used as a platform for online sports gambling."  Google Aff. ¶ 40.  The Magistrate was free to discount or ignore the evidence regarding FanDuel if he agreed that "fantasy sports competitions for cash payouts" fell outside the scope of the Wire Act or UIGEA.[7]  Further, as the defendant acknowledges elsewhere (at 24), the subsequent Microsoft Affidavit omitted any reference to FanDuel—proving that the FanDuel evidence was not necessary to the finding of probable cause.

---

[6] The defendant elsewhere implies, but does not explicitly state, that the $12,000 the defendant received via PayPal from a gambling partner was a loan between "friends."  *See* ECF No. 22-1, at 45 ("[I]t is likely that Person B and Guertin are friends who have loaned money to each other from time to time.").  Extending loans to gambling partners, *i.e.* loan sharking, can be one way to engage in a gambling business.

[7] The defendant argues that fantasy sports competitions are exempted from the definition of "bet or wager" under UIGEA, *see* 31 U.S.C. § 5362(1)(E)(ix).  First, any statutory exemption in UIGEA does not apply to the Wire Act.  Second, fantasy sports exemption is contingent on a number of additional factual predicates guaranteeing, for instance, that a fantasy sports team is not "based on the current membership of an actual team," and other requirements.  31 U.S.C. § 5362(1)(E)(ix)(I)-(III).  It is a fact question whether FanDuel *could* have been used at that time to replicate betting on sports outcomes in a way that fell outside the United UIGEA exemption.

### C. The Defendant's Challenge to the Microsoft Affidavit Does Not Establish any Other Intentional Misstatements that Were Material to Probable Cause

The defendant challenges the Microsoft Affidavit by largely repeating the same accusations raised in the context of the Google Affidavit. One additional claim is that the agent mischaracterized the defendant's undisclosed $225,000 loan agreement with two Chinese nationals, which was collateralized by a one-third interest in his home, by stating in the affidavit that the Chinese nationals "purchased 33.33% ownership interest in his property." Microsoft Aff. ¶ 27. To be sure, there is a distinction between an outright purchase of an ownership interest and a collateralized loan with an option to purchase an ownership interest at the end of the loan term. But the case agent is not a real estate lawyer, and the D.C. Circuit has admonished reviewing courts to "give an affidavit a sensible, pragmatic reading, one that takes account of the pressure of time and the typical level of verbal skills in laymen police officers." *Richardson*, 861 F.2d at 293-94 (internal quotation omitted).

More importantly, any error in describing the terms of the contract was immaterial to its relevance in the affidavit. In broad terms, the affidavit stated that the defendant entered into a substantial $225,000 financial obligation with two Chinese nationals, and failed to disclose it on his SF-86. That was clearly true, and it clearly established a violation of 18 U.S.C. § 1001 for purposes of the affidavit. The fact that the financial obligation was a collateralized loan agreement with an option to take an ownership interest, and not an outright purchase of an ownership interest, did not make the defendant's concealment of this arrangement any less a violation of § 1001.

Finally, the defendant attempts to smear the agent who swore out the warrant affidavits by baselessly claiming (at 24) she was engaged in a "personal crusade against him." The agent was simply doing her job—in an investigation that resulted in a federal grand jury indicting the

defendant on serious felony charges.   There is absolutely no ground for the defendant's *ad hominem* attack, and it is misplaced in a serious motion before this Court.

### III.      The Defendant's "Corrected" Affidavit Is Baseless and Irrelevant

The defendant concludes his motion with an apparent attempt at satire by presenting (at 39) a "hypothetical affidavit in Agent Leipfert's own voice."  Whatever the merits of this approach, it does not reflect the legal standard under *Franks*, and it repeats the same fallacies addressed above—including assuming omniscient knowledge on the part of the agent, making wild inferential leaps ("I am aware that he received an email from Ambassador Huntsman following a weekend crisis," *etc.*), opining about how the defendant believes law enforcement should have gone about its investigation ("I called Guertin's supervisor," *etc.*), glossing over incriminating facts while focusing in inconsequential details, and so on.

First, the Court need not consider such a hypothetical corrected affidavit until the defendant carries his burden, after a hearing and by a preponderance of the evidence, that the agent made false statements intentionally or with reckless disregard for the truth.  *Franks*, 438 U.S. at 156.  As discussed above, the defendant has not carried his threshold burden of making a substantial preliminary showing of intentional, material misstatements to justify holding a *Franks* hearing in the first place, let alone carry his ultimate burden.

Second, the Court's analysis is limited to determining whether, "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause."  *Id.* at 156.  The Court is not called upon to insert page after page of commentary, speculation, and irrelevant factual detail, such as the one time the defendant assisted Ambassador Huntsman over the weekend.  Even if the Court considered an affidavit correcting the three factual errors described above—stating that the defendant's tenure at INR was one year; stating that he

adjudicated two out of three visas for the visa applicants whose PII was stored in the defendant's private Google email account; and stating that there was evidence that could support the conclusion that PERSON A and her spouse were legitimate renters in the defendant's house—the warrant affidavits would still be sufficient for a finding of probable cause. "Good faith, probable cause, and, at bottom, reasonableness—not perfection—are what the Fourth Amendment requires." *Thorne*, 2021 WL 2682631, at *21.

## CONCLUSION

For the foregoing reasons, the defendant's Motion To Suppress should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ Christopher B. Brown*
Christopher B. Brown, D.C. Bar No. 1008763
Thomas Gillice, D.C. Bar No. 452336
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7153 (Brown)
(202) 252-1791 (Gillice)
Christopher.Brown6@usdoj.gov
Thomas.Gillice@usdoj.gov