UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>PAUL MICHAEL GUERTIN,<br><br>Defendant. | Case No. 1:21-cr-262 (TNM) |

## MEMORANDUM OPINION

Paul Michael Guertin stands accused of committing wire fraud, in violation of 18 U.S.C. § 1343 (Count I), and obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count II). He seeks dismissal of the Indictment, arguing that his alleged misconduct—false statements relating to a routine security clearance renewal—does not support an offense under either provision. The Court agrees. Although both statutes are notoriously capacious, they have limits, and the Government strays beyond those limits here.

### I.

Guertin is a former Foreign Service Officer in the U.S. Department of State.[1] During part of his ten-year tenure, Guertin served at the U.S. Consulate in Shanghai adjudicating visa applications. He also served in the Department of State's Intelligence & Research Division in Washington, D.C. As a condition of his employment, Guertin had to pass periodic background- and security-clearance investigations.

---

[1] In considering a motion to dismiss, a court "is limited to reviewing the face of the indictment." *See United States v. Payne*, 382 F. Supp. 3d 71, 73 (D.D.C. 2019). So the Court will rely exclusively on background facts alleged in the Indictment. *See* ECF No. 1.

In 2010 and 2016, Guertin allegedly lied on his background investigation questionnaire, the Standard Form 86 (SF-86). According to the Government, Guertin failed to disclose certain information required by the SF-86—a sexual relationship with a foreign national whose visa application he had adjudicated; certain financial problems arising out of gambling activity; and an undisclosed loan agreement with two Chinese nationals collateralized by Guertin's home.[2] Guertin also allegedly lied to State Department investigators during the background investigation to conceal this information. A federal grand jury indicted Guertin, charging him with wire fraud, *see* 18 U.S.C. § 1343 (Count I), and obstructing an official proceeding, *see id.* § 1312(c)(2) (Count II). Indictment ¶¶ 20–36, 37–38. Guertin now moves to dismiss the Indictment, arguing the Government has not alleged facts supporting a conviction under either Count. *See* Mot. to Dismiss (MTD), ECF No. 21.

The motion is ripe for resolution and the Court has jurisdiction. *See* 18 U.S.C. § 3231.

## II.

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). A defendant may move to dismiss an indictment on grounds that it fails to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "The operative question is whether the[] allegations, if proven, are sufficient to permit a jury to find that the crimes charged were committed." *United States v. Payne*, 382 F. Supp. 3d 71, 74 (D.D.C. 2019) (cleaned up).

---

[2] The SF-86 prominently warns applicants that false statements can lead to prosecution under 18 U.S.C. § 1001. For reasons known only to the Government, it charged Guertin with two other, more serious (but less applicable) offenses instead.

### III.

The Indictment charges Guertin with wire-fraud in violation of 18 U.S.C. § 1343 and obstructing an official proceeding in violation of 18 U.S.C. § 1512(c). Because the facts alleged in the Indictment cannot support a conviction under either provision, both Counts fail.

### A.

The federal wire-fraud statute prohibits engaging in "any scheme or artifice to defraud" using the wires for the purpose of "obtaining money or property." 18 U.S.C. § 1343; *see also Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). Count I of the Indictment alleges Guertin

> devised and intended to devise a scheme to defraud and to obtain money and property from the State Department by means of materially false and misleading statements, and by withholding and concealing information, on his SF-86 background investigation questionnaires and in interviews with State Department background investigators.
> . . .
> It was the purpose of the scheme to defraud for the defendant . . . to unlawfully enrich himself *by maintaining his State Department employment and salary*[.]

Indictment ¶¶ 21–22 (emphasis added).

The question presented here is whether those factual allegations state an offense under § 1343. The plain meaning of § 1343 and Supreme Court precedent both point to the same conclusion—a scheme to "maintain" a pre-existing salary cannot support a wire-fraud conviction. Count I cannot stand.

### 1.

To start, the Indictment does not, on its face, allege conduct falling within the plain meaning of § 1343.

Guertin allegedly sought to "maintain[] . . . his . . . State Department employment and salary." Indictment ¶ 22. But a scheme to "maintain" something is not synonymous with a scheme to "obtain" the same thing. The word "obtain" generally connotes affirmative action to

3

secure something outside one's possession.  *See Obtain*, *Black*'s *Law Dictionary* (11th ed. 2019) (defining the term as to "bring into one's own possession; to procure").  The word "maintain," by contrast, connotes action to preserve the status quo.  *See Maintain*, *id.* (defining the term as "[t]o continue in possession of (property etc.)").  The upshot is that to state an offense under the plain meaning of § 1343, the Government must allege a defendant's scheme sought to gain possession of something not previously in his possession.  And by extension, the Indictment's allegation that Guertin merely sought to "maintain" his salary does not suffice.

The Government says the obtain/maintain distinction is irrelevant on these facts: "[I]f the alternative, absent fraud, is that the defendant is likely to lose his job . . . then the fraudulent scheme clearly is intended to obtain money or property that he would not otherwise have obtained, namely, his continued salary."  Opp. 11.  There are three problems with that argument.

*First*, the Government relies on tortured semantics—it is a contradiction in terms to say a defendant's scheme enables him to "obtain" a pre-existing contractual right like a "continued salary."  The only way to make sense of that contradiction would be to ignore the active, affirmative connotations of the word "obtain."  The Court will not do so.  *Cf. Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (explaining that "unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning").

*Second*, the Government musters no binding or persuasive authority to support its interpretation of "obtain."  Most of the Government's cited cases involve schemes to obtain something new—a job, a promotion, a grant, or bonus—not schemes to "obtain" a "continued salary."  *See* Opp. 4–7; *United States v. Granberry*, 908 F.2d 278, 279 (8th Cir. 1990) (upholding conviction for defendant who allegedly falsified his criminal history to obtain a job as a school bus driver); *United States v. Doherty*, 867 F.2d 47, 56 (1st Cir. 1989) (upholding conviction for

4

scheme which sought "appointment to or promotion within police departments" to receive "the salary or increased salary by reason of appointment to or promotion within the police department").

To be sure, *Granberry* invoked sweeping language that supports the Government's argument. *See Granberry,* 908 F.2d at 280 ("What the School . . . wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and that is not what it got."). But judicial opinions are not statutes, and its holding—upholding a conviction for a fraudulent scheme to secure *new* employment—does not get the Government where it needs to go. The Government is left with one on-point case supporting its position: a trial court opinion that predates persuasive appellate authority to the contrary. *See United States v. Feng Tao*, 499 F. Supp. 3d 940, 953–54 (D. Kan. 2020) (refusing to dismiss wire fraud charge for professor who failed to notify university of his violation of conflict-of-interest policies).

Indeed, the only circuit courts to address the issue have rebuffed the Government's salary-maintenance theory. *See United States v. Yates*, 16 F.4th 256, 266 (9th Cir. 2021); *United States v. Goodrich*, 871 F.2d 1011, 1013–14 (11th Cir. 1989). Consider *Yates*. There, the Government charged two bank managers with conspiring "to conceal the true financial condition of the Bank" to deceive "the Board of Directors, shareholders (current and prospective), regulators and the public." 16 F.4th at 263; *see also* 18 U.S.C. § 1349 (making it unlawful to "conspire[] to commit any offense under this chapter"); *id* § 1344 (making it unlawful to "knowingly execute . . . . a scheme or artifice . . . to defraud a financial institution").[3] At trial, the Government argued defendants had deprived the bank of three property interests: (1)

---

[3] The Supreme Court has construed § 1341, § 1343, and § 1344 similarly. *See Neder v. United States*, 527 U.S. 1, 20–21 (1999).

"accurate financial information in the bank's books and records"; (2) "the defendants' salaries [and] bonuses"; and (3) "the use of bank funds." *Id.* at 264. The court held theory (2), a salary-maintenance theory, could not support conviction. *See id.* at 266 (noting the "difference between a scheme whose object is to obtain a new or higher salary and scheme whose object is to deceive an employer while continuing to draw an existing salary.").[4] Eliding the difference between the two "would criminalize a range of commonplace conduct." *Id.* at 267. The Government offers no appellate precedent contravening this straightforward reasoning.

*Third*, if there were any remaining question whether "obtaining money or property" can mean "maintaining money or property," the Court must resolve that ambiguity in Guertin's favor. *See Yates v. United States*, 574 U.S. 528, 547–48 (2015) ("[I]f our recourse to traditional tools of statutory construction leaves any doubt about [] meaning . . . we would invoke the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (cleaned up)).

Because the Indictment alleges that Guertin sought to "maintain," not "obtain" a salary, it does not state an offense within the plain meaning of § 1343. And this is not just semantics. The Government could not have sustained an "obtain" theory on the facts alleged.

**2.**

Extending the wire-fraud statute to these facts would also contravene longstanding Supreme Court precedent. For decades, the wire-fraud statute and its mail-fraud twin, 18 U.S.C. § 1341, have been a go-to tool for prosecutors combating white collar chicanery. *See* Jed S.

---

[4] The otherwise split panel was apparently unanimous on this point. *See* 16 F.4th at 287 (Bress, J., dissenting) ("The majority also concludes that depriving the bank of defendants' salaries and bonuses was not the deprivation of property either. I suspect the majority is not correct when it comes to *performance-based compensation*." (emphasis added)).

Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 Dusquene L. Rev. 771 (1980) ("To federal prosecutors of white-collar crime, the mail fraud statute is our Stradivarius, our Colt .45, our Louisville Slugger[.]"). And as then-Assistant U.S. Attorney Jed Rakoff intimated, prosecutors have periodically overused it. *Id.* ("It understands us and, like many a foolish spouse, we like to think we understand it. To ask us to explain it or deal with its problems, however, is quite another matter[.]"). The Government's theory here attempts to resurrect a now-discredited, overbroad use of these statutes.

Historically, courts construed the related mail-fraud statute, 18 U.S.C. § 1341, to "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial government." *McNally vs. United States*, 483 U.S. 350, 355 (1987). "Unlike fraud in which the victim's loss of money or property supplied the defendant's gain . . . the honest-services theory targeted corruption that lacked similar symmetry." *Skilling v. United States*, 561 U.S. 358, 400 (2010).

Consider a typical example: a city mayor receives a bribe from a third party in exchange for awarding it a valuable contract. Assuming the contract is identical to one that would have been reached in an honest bargaining process, the city has not suffered a pecuniary loss and any illicit profits come from a third party. In such a situation, "courts reasoned, actionable harm lay in the denial of [the city's] right to the [mayor's] 'honest services.'" *Id.* Honest-services prosecutions could arise out of a private employee's breach of duty to his employer, too. There, the actionable "deception . . . is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests." *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942).

This extension of federal fraud statutes to cover "intangible rights" was controversial. Some argued honest-services prosecutions threatened to extend federal criminal liability to all manner of public and private misrepresentations. *See, e.g.*, John C. Coffee, Jr., *The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of A White-Collar Crime*, 21 Am. Crim. L. Rev. 1, 2 (1983) ("The mail fraud statute seems destined to provide the federal prosecutor with what Archimedes long sought—a simple fulcrum from which one can move the world."). And because the realm of potentially covered misrepresentations was capacious, ordinary people could not readily determine the scope of potential liability under the statute. *Id.* at 9 ("[T]here is an impact not only on those who are guilty of misconduct, but also on those who are risk averse and insist on arranging their affairs so as to avoid any chance of entanglement with the criminal law."). Those concerns make some sense—reading mail- and wire-fraud statutes to sweep in a vast, ambiguous realm of public/private interactions would run against well-established norms of fair notice and due process. *See Johnson v. United States,* 576 U.S. 591, 595 (2015) (noting the Government violates the Fifth Amendment where it "tak[es] away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes").

Those critiques ultimately won out. In *McNally*, the Supreme Court held the mail fraud statute covers only conduct intended to deprive a victim of property rights, not intangible rights like honest services. *See McNally*, 483 U.S. at 361. There, Kentucky officials had selected an insurance company for the Commonwealth based on an illicit agreement that the company would share commissions with other agencies partially owned by the same officials. *Id.* at 352–53. There was no suggestion that "in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance." *Id.* at 360. The question before the

Court was whether the officials could be convicted of mail fraud without that showing of loss to Kentucky.

The Court answered that question "no."  In its view, extending § 1341 to "intangible rights" cases "leave[s] its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials."  *Id.* at 360. The Court thus construed the statute as "limited in scope to the protection of property rights."  *Id.* And because the trial court did not require the jury to find "the Commonwealth itself was defrauded of any money or property," the defendants' convictions could not stand.[5]  *Id.* at 361.

Justice Stevens dissented, arguing the requirements of the mail-fraud statute were met irrespective of whether deprivation of "intangible rights" is cognizable:  "When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for."  *McNally*, 483 U.S. at 377 n.10 (Stevens, J., dissenting).

The Government's theory of the case here revivifies Justice Stevens' dissent in slightly different garb:  The Department of State paid Guertin a salary for his loyal services; he breached that loyalty through fraud during the SF-86 process; and his salary constitutes a cognizable property loss to the Department of State.  But that's just private-sector honest-services fraud—a case in which the employee's criminal conduct arises out of his "continued representation . . . to

---

[5]  Congress responded the next year by enacting a new statute to revive the honest-services doctrine.  *See* 18 U.S.C. § 1346 (clarifying that in mail fraud (§ 1341) and wire fraud (§ 1343) prosecutions, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services").  The Supreme Court later determined § 1346 was vague in its scope, and so read the statute narrowly to cover only conduct falling within the core of pre-*McNally* honest-services fraud—"schemes to deprive another of honest services through bribes and kickbacks supplied by a third party."  *Skilling*, 561 U.S. at 404.  *Skilling* is less relevant than *McNally* here because the meaning of § 1346 has little direct bearing on the meaning of §1343, while § 1341 and § 1343 are nearly identical.

the employer that he is honest and loyal to the employer's interests." *Procter & Gamble Co.*, 47 F. Supp. at 678; *see also Yates*, 16 F.4th at 267 ("Permitting the government to recharacterize schemes to defraud an employer of one's honest service . . . as schemes to deprive the employer of a property interest in the employee's continued receipt of a salary would work an impermissible end run around the Court's holding in *Skilling*.") (cleaned up).  True, the alleged *breach of duty* is different here—Guertin violated a contractual duty of honesty, not a fiduciary duty of honesty—but the alleged *deprivation* arising out of that breach is the same.  In either case, the victim's deprivation is the loss of an employee's bargained-for loyal services.

The Government's argument thus proves too much.  If an employee violates § 1343 any time he engages in a fraudulent scheme to keep his job, then *McNally*'s honest-services holding contains an exception so vast it swallows the rule.  In almost every honest-services prosecution the defendant receives a salary from the victim of the fraud (an employer/governmental entity).  To avoid the *McNally* rule, the Government would simply need to add one line to its indictment alleging the defendant received a "continued salary" from the victim.  And with that one line, federal prosecutors could set "standards of disclosure and good government for local and state officials" as well as private employers.  *McNally* at 360.  The Court cannot contravene *McNally* and so substantially widen the sweep of federal criminal liability.  *See Goodrich*, 871 F.2d at 1013-14.

To state an offense under § 1343, an indictment must allege the defendant engaged in a scheme to obtain "property or money."  Because the Indictment here solely alleges that Guertin

10

sought to maintain his pre-existing salary, it does not state an offense under § 1343. Count I of the Indictment must be dismissed.[6]

### III.

The next question is whether the Indictment alleges Guertin obstructed an "official proceeding" in violation of 18 U.S.C. § 1512(c)(2).

Section 1512(c)(2) makes it unlawful to corruptly obstruct "any official proceeding." *Id.* A related provision defines "official proceeding" as follows:

- a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

- a proceeding before the Congress;

- *a proceeding before a Federal Government agency*, which is authorized by law; *or*

- a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

18 U.S.C. § 1515(a)(1)(A) (emphasis added); *see also id.* § 1515(a) (incorporating this definition into § 1512). Count II alleges Guertin obstructed "a background investigation and security clearance adjudication by the United States Department of State." Indictment ¶ 38. The question here is thus whether the security-clearance process is "a proceeding before a Federal Government agency," under § 1515.

---

[6] The Court therefore need not consider Guertin's alternative argument that he did not cause anyone to send a qualifying wire.

The answer to that question must be "no." The plain meaning of § 1512(c)(2) and § 1515(a)(1)(A) is unambiguous—an informal, routine agency action like clearance-adjudication does not fall within the statutory definition of an "official proceeding."

### A.

Perhaps needless to say, "the meaning of 'official proceeding' depends heavily on the meaning of the word 'proceeding.'" *United States v. Sandlin*, No. 21-CR-88 (DLF), ___ F. Supp. 3d ___, 2021 WL 5865006, at *3 (D.D.C. Dec. 10, 2021). There are two possible definitions of the term "proceeding." The term can broadly refer to "[t]he carrying on of an action or series of actions." *Proceeding*, Oxford English Dictionary (3d ed. 2007); *United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013). Or it can refer more narrowly to "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, Black's Law Dictionary (11th ed. 2019). Here, there are good statutory reasons to choose the narrower definition. This reading also adheres to the bulk of caselaw in this area. *See Sandlin*, 2021 WL 5865006, at *3 ("courts, considering various statutory cluses, have consistently held that 'proceedings' should be defined narrowly.").

In Section 1512(c)(2), the word "official" appears before "proceeding," textually limiting covered proceedings to those bearing indicia of officiality. *See* 18 U.S.C. § 1512(c)(2); *cf. Official*, Oxford English Dictionary (3d ed. 2004) (defining the term as "characteristic of an official; formal, ceremonious"). And throughout § 1512, Congress used the phrase "official proceeding" in a manner that connotes a formal hearing in which persons are called to appear. *See, e.g.*, 18 U.S.C. § 1512(a)(1)(A) (making it unlawful to kill with intent to "prevent the attendance or testimony of any person in an official proceeding"); *id.* § 1512(a)(2)(B)(iii) (making it unlawful to cause a person to "evade legal process summoning that person to appear

as a witness, or to produce a record, document, or other object, in an official proceeding"); *id.* § 1512(d)(1) (making it unlawful to "intentionally harass[]" a person to dissuade him from "attending or testifying in an official proceeding").

The definitional provisions in § 1515(a)(1) buttress that reading. As relevant here, § 1515 defines an "official proceeding" as one "before a Federal government agency." *Id.* § 1515(a)(1)(C). The word "before" suggests an "official proceeding" would typically entail convening a formal tribunal or adjudicative body *before which* parties are compelled to appear. *See Before*, Oxford English Dictionary (3d ed. 2004) (defining the term as "[i]n front of so as to be in the sight or hearing of; in or into the presence of"; "in giving evidence or answering a charge").

And the requirement that any proceeding be before "a federal government agency," 18 U.S.C. § 1515(A)(1)(C), suggests the statute only covers those proceedings where officials act as a representative of the agency. Indeed, § 1515(a)'s neighboring definitional provisions use "official proceeding" in exactly that sense, each referring to a formal body convened to exercise the power of a broader governmental unit. *See, e.g.*, 18 U.S.C. § 1515(a)(1)(A), (B) (defining "official proceeding" to include "a proceeding before a judge or court of the United States," "a proceeding before . . . a Federal grand jury," or "a proceeding before the Congress").

Taken together, § 1515(a)(1) and § 1512 make clear that a covered "proceeding before a Federal government agency" must resemble a formal tribunal. *See Ermoian*, 752 F.3d at 1171 (defining an "official proceeding before a Federal Government agency" as "an agency sitting as a tribunal"); *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008) (defining the same as a "formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency").

13

**B.**

Here, the Government does not allege Guertin obstructed a covered proceeding. The Indictment lays out the following details concerning the security-clearance adjudication process:

- Any applicant for a security clearance must fill out a background investigation questionnaire known as the Standard Form 86 (SF-86);

- The applicant then must undergo an "extensive background investigation, where, among other things, [he] is required to provide the investigating agency with access to the employee's financial records, consumer reports, and travel records";

- The investigator—an ad hoc federal contractor—then conducts several interviews, including interviews with the employee;

- The investigator then submits the results of the investigation to an employee of the State Department Office of Personnel Suitability and Security (PSS);

- The PSS employee adjudicates the application and recommends granting, denying, or revoking a clearance.

Indictment ¶¶ 6–8; *see also* 12 FAM § 230 *et seq.*

That process bears scant resemblance to a formal tribunal. The "proceeding" alleged here involves a single, low-level bureaucrat issuing a routine certification. There is no body "before" which Guertin had to appear, much less an "official" body approaching the formality of a "court" or "Federal grand jury." 18 U.S.C. § 1515(a)(1)(A). Nothing in the Indictment suggests the PSS adjudicator acts *as* the Department of State in the same way—for example—an immigration judge acts *as* the Executive. Were the Court to extend § 1512(c)(2) to these facts, it is hard to imagine any routine agency action that would not be an "official proceeding before a Federal agency." 18 U.S.C. § 1515(a)(1)(C).

The Government disagrees, embracing a sweeping interpretation of § 1512(c)(2). Following *Rice v. United States*, 356 F.2d 709 (8th Cir. 1966), the Government says the word "proceeding" embraces "proceeding in the manner and form prescribed for conducting business before the department or agency, including all steps and stages in such an action from its

14

inception to its conclusion." Opp. 23 (quoting 356 F.2d at 712). But *Rice* is of limited use because that case dealt with a different statutory provision. *See* 356 F.2d at 710; 18 U.S.C. § 1505 (making it unlawful to "obstruct[] . . . any pending proceeding . . . before any department or agency of the United States"). The Government's argument seems to be that the word "proceeding" must mean the same thing in both statutes. *See* Opp. 24 n.10 (noting Guertin did not "explain why the same word in two closely related obstruction statutes should be construed inconsistently").

That argument runs headlong into the text. Section 1515 contains a sui generis definition of "official proceeding," applicable only to §§ 1512 and 1513. *See* 18 U.S.C. § 1515(a) ("As used in sections 1512 and 1513 of this title . . . the term 'official proceeding' means . . . ."). The statute thus provides an express basis for treating the term "proceeding" differently in § 1512(c)(2) than one might in § 1505. And even more to the point, the two provisions *are* textually distinct—§ 1505 contains none of the above-mentioned indicia limiting its applicability to formal tribunals.[7]

At first blush, *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009), appears to support reading "official proceeding" broadly enough to cover these facts. That case involved the prosecution of three federal corrections officers who lied to Bureau of Prisons (BOP) investigators during a use-of-force investigation. *See* 575 F.3d at 165–66. BOP investigatory protocols required a corrections officer to prepare a Use of Force Report and to compile relevant

---

[7] The same issue plagues the Government's reliance on *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 2009). As the Government's own summary of the case concedes, *Kelley* interpreted the statutory phrase "pending proceeding" in § 1505 and merely assumed without deciding that § 1505 and § 1512(c)(2) would have comparable meanings. *See* Opp. 28; *Kelley*, 36 F.3d at 1127. It thus has little relevance here. *Ermoian*, 752 F.3d at 1171, n.5 (finding *Kelley*'s § 1505 analysis "carries no persuasive weight" in interpreting § 1512).

documentation. *Id.* Once the officer completed the paperwork, he would forward it to an After-Action Review Committee (AARC) "composed of the Warden, the Associate Warden (responsible for correctional services), the Health Services Administrator, and a BOP Captain." *Id.* at 166. The AARC would then refer any further investigatory matters to the Office of Inspector General, the BOP internal-affairs office, or the FBI. *Id.*

The question presented was whether that process constitutes an "official proceeding" under 1512(c)(2). The panel held that it was, explaining, "Because the [AARC] must 'determine' if there has been a violation of BOP policy, must make 'findings,' and may 'decide' to refer the matter to senior departmental authorities, its work is sufficiently formal to satisfy the 'official proceeding' element of subsection 1512(c)(1)." *Id.* at 169.

But that holding is ultimately unavailing for the Government here. The AARC involved (1) a panel of (2) senior officials (3) exercising disciplinary authority. *See id.* ("Obstructing the work of a body of senior officials, charged with such quasi-adjudicative responsibilities, fits comfortably within the category of conduct proscribed by section 1512."). Each of these factors more closely resembles a formal tribunal and not one of them is present here. So even if *Perez* is right on those facts, the Government is still wrong on these facts.[8]

Of more relevance is the Fifth Circuit's decision in *Ramos*. There, U.S. Customs and Border Protection (CBP) agents were prosecuted for lying during a use-of-force investigation. *See* 537 F.3d at 446. Unlike in *Perez*, there was no allegation the defendants had obstructed a formal review hearing, only an investigation. *See id.* n.16. One of the questions presented was

---

[8] Moreover, the *Perez* panel felt bound by a previous Second Circuit decision, *United States v. Gonzalez*, which had "read the term 'official proceeding' broadly in order to effect Congress' purpose in passing the Victim and Witness Protection Act." 922 F.2d 1044, 1056 (2d Cir. 1991) (cleaned up); *Perez*, 575 F.3d at 168 (discussing *Gonzalez* at length). *Perez* thus relies on outdated interpretive premises, making it of less persuasive value to this Court.

16

thus "whether the Border Patrol's internal investigation of alleged employee misconduct . . . is 'an official proceeding' within the meaning of § 1512." *Id.* at 461.  The court held it was not—in its view, § 1512(c)(2) connotes "a hearing rather than simply an investigatory step taken by an agency." *Id.* at 463.  Because the CBP use-of-force investigation fell into the latter category, it was not an "official proceeding" under § 1512.  *Id.*  So too here.  Guertin's conduct obstructed a preliminary, largely investigatory process conducted by low-level employees.  The PSS clearance process lacks both the formality and the hearing the Fifth Circuit expected in an official proceeding.

The Government has made passing reference to a formal appeal process available after an adverse clearance-adjudication.  *See* Opp. 22.  Apparently, this process involves senior Department officials and the opportunity for a hearing.  But the Court is limited to the allegations in the Indictment, *see Payne*, 382 F. Supp. 3d at 73, and the Indictment mentions no such process.

Even if the Indictment *had* alleged a formal appeal process, it would have little relevance. As the Government acknowledges, the appeals process only takes place if the clearance-applicant receives an adverse decision *and* seeks to challenge that decision.  *See* Opp. 22.  That did not happen here.  And as the parties acknowledge, most clearance-adjudications are not appealed.  It thus makes little sense to say Guertin's conduct was directed at obstructing that process.  *See Ermoian*, 752 F.3d at 1170–71 (holding a criminal investigation is not an "official proceeding," even though it might *lead to* an "official proceeding" like a federal grand jury or criminal trial); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (interpreting a materially similar subsection of § 1512 as requiring that the defendant have "knowledge that his actions are likely to affect [a] judicial proceeding" to have the "requisite intent to obstruct").  So

17

the Court will not reach whether the State Department's clearance-adjudication appeals process constitutes an "official proceeding" under § 1512(c)(2).

In sum, § 1512(c)(2) and § 1515(a)(1)(C) make it unlawful for an individual to corruptly obstruct a federal agency sitting as a formal tribunal.  Here, the Indictment does not allege Guertin obstructed a covered proceeding and therefore does not state an offense under 18 U.S.C. § 1512(c)(2).  Count II of the Indictment must be Dismissed.

## IV.

Guertin's conduct, as alleged by the Government, is disturbing and quite possibly constitutes a terminable offense.  But we are a government of laws and not of men, and the Government has not properly alleged any violation of federal law here.  The Indictment will therefore be dismissed.[9]  An appropriate Order accompanies this Opinion.

Dated: January 24, 2022                                     TREVOR N. McFADDEN, U.S.D.J.

---

[9] Guertin also argued the Indictment had to be dismissed because of the Government's alleged misconduct during grand jury proceedings.  *See* MTD 24.  Given the Court's holdings above, the Court need not and does not reach this issue.